FILED

Michael F. Sisson, State Bar #108855
Law Office of Michael F. Sisson
18411 Crenshaw Blvd., Suite 220
Torrance, California 90504
(310) 719-8894

2011 MAR 24  PM 2: 25

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY_____

Attorney for plaintiff, Jeremy A. Moore

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEREMY A. MOORE, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>COUNTY OF LOS ANGELES; STEVE COOLEY, PETER BLISS, PAM BOOTH, JACQUELYN LACEY, JOHN SPILLANE, JULIE DIXON SILVA,<br><br>Defendants. | CASE NO. 10-7694 ODW (SSx)<br><br>(Honorable Otis D. Wright II)<br><br>**FIRST AMENDED COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**<br><br>**DEMAND FOR JURY TRIAL** |

## PRELIMINARY STATEMENT

1. This case arises from an anti-union policy implemented by Defendant Steve Cooley, the District Attorney ("DA") of Los Angeles County, and his senior officials.

2. Defendants' anti-union policy targets Deputy District Attorneys ("DDA's") who have joined or supported the formation and certification of the Association of Deputy District Attorneys ("ADDA"), a Los Angeles County Employee Organization that is certified as the official representation for Los Angeles County Employees Bargaining Unit 801. On January 24, 2011, the court entered an order

1

1   granting the ADDA's Motion to Certify Class in a related case, *One*
2   *Unnamed Deputy District Attorney v. County of Los Angeles,* USDC Case
3   No. CV 09-7931 ODW. A true and correct copy of the Order Granting
4   ADDA's Motion to Certify Class is attached hereto as Exhibit 1 ("The
5   Order"). The Order is based, inter alia, on allegations that District
6   Attorney Steve Cooley and the County of Los Angeles retaliated against
7   Deputy District Attorneys that had "signed 'union cards' between
8   December 2007 and February 2008 indicating their desire to unionize."
9   (See Exhibit 1, p. 1, ll. 19-20). The instant action alleges that
10  Plaintiff signed a union card indicating his desire to unionize in
11  about March of 2008 and that Defendants thereafter retaliated against
12  him therefor. However, the date Plaintiff signed his union card places
13  him just outside of the class established by The Order and Plaintiff's
14  only legal redress is the instant action.

15      3. Plaintiff Jeremy A. Moore sought to exercise his First
16  Amendment rights of freedom of speech and association to engage in
17  union-related activities without being subjected to Defendants' policy
18  of discrimination.

19      4. Defendants' discrimination and retaliation against Plaintiff
20  based on Plaintiff's support of the ADDA was especially severe as
21  Defendants constructively terminated Plaintiff's employment as a
22  Deputy District Attorney due to the Plaintiff's exercise of
23  constitutionally protected civil rights.

24

25                    **JURISDICTION AND VENUE**

26      5. This Court has subject matter jurisdiction over this case
27  under 28 U.S.C. § 1331, as this action arises under the First and
28  Fourteenth Amendments to the United States Constitution; under 28

2

1  U.S.C. § 1343(a)(3), in that the Plaintiff seeks redress for
2  deprivations made under color of state law of rights, privileges, and
3  immunities secured by the United States Constitution; under 28 U.S.C.
4  § 1983, which provides a cause of action for the protection of civil
5  rights; and under 42 U.S.C. § 1988(b) for an award of attorneys fees.

6      6. Venue is proper in the United States District Court for the
7  Central District of California under 28 U.S.C. § 1391(b), because the
8  events giving rise to the claims described herein occurred within Los
9  Angeles County.

10                              **PARTIES**

11     7. Plaintiff, Jeremy A. Moore, is an individual and, at all
12  relevant times mentioned herein, was a resident of Los Angeles County,
13  State of California. Plaintiff was employed by the County of Los
14  Angeles as a Deputy District Attorney Grade I from approximately March
15  9, 2008, through March 9, 2009.

16     8. Defendant Los Angeles County is a municipal corporation and
17  employed the Plaintiff on or about March 9, 2008, through March 9,
18  2009. The remaining individual defendants, sued here in both their
19  personal and official capacities, were at all times mentioned herein
20  employees and/or agents of Los Angeles County.

21     9. Defendant Steve Cooley is, and at all times mentioned herein
22  was, the District Attorney for the County of Los Angeles. This
23  Defendant, Plaintiff is informed, resides in the County of Los
24  Angeles. Steve Cooley was first elected to office in November 2000 and
25  his office employs approximately 1,000 deputy prosecutors. Defendant
26  Steve Cooley is sued in his personal and official capacity.

27     10. Defendants Peter Bliss, Pam Booth, Jacquelyn Lacey, John
28  Spillane, and Julie Dixon Silva have been at all times pertinent to

3

FIRST AMENDED COMPLAINT

this action top ranking officials in the administration of Defendant Steve Cooley. Each of these Defendants has authority over promotions, demotions, transfers, discipline, and termination within the District Attorney's Office and each illegally discriminated against Plaintiff due to his status as a supporter of the ADDA. Defendants' policy of discrimination is described in detail below. Each of these defendants is sued in his or her personal and official capacities.

11. Plaintiff is informed, believes, and therefore alleges that Defendants, and each of them, conspired and agreed among themselves to do the acts complained of herein and were, in doing such acts, acting pursuant to and in furtherance of said conspiracy, and each Defendants sued herein is jointly and severally responsible and liable to the Plaintiff for the damages alleged herein.

12. Defendants, and each of them, and/or their agents/employees knew or should have known that each of the remaining co-Defendants, individually and together in varying combinations, was engaging in the conduct alleged herein.

### Facts Showing The Backdrop Of Plaintiff's
### Employment And The Anti-Union Atmosphere.

13. On or about March 24, 2008, the ADDA was certified by the Employee Relations Commission "ERCOM") as the employee organization recognized to represent the prosecutors of County Bargaining Unit 801 on or about March 24, 2008. The ADDA is a full-fledged public employees union with the same rights and responsibilities as any other County-recognized union. ERCOM is a body that was established by ordinance in 1969 to regulate labor relations in Los Angeles County.

14. In the months leading up to the ADDA's certification by ERCOM, the Board of Directors of the ADDA became concerned about

FIRST AMENDED COMPLAINT

1  potential retaliation by Steve Cooley and his agents against DDAs that
2  might be interested in joining the ADDA. It was well known amongst
3  DDAs that Steve Cooley frowned on the participation of DDAs in union
4  activities. Accordingly, on December 28, 2007, ADDA Board of Director
5  Frank Tavelman asked Assistant District Attorney Jacquelyn Lacey, one
6  of the top officials in the DA's Office, to issue a memorandum to all
7  prosecutors stating the DA's Office would be neutral regarding union
8  organization and would refrain from retaliating against any prosecutor
9  for exercising his or her right to join ADDA. Ms. Lacey refused to
10  comply with that request.

11     15. Steve Cooley thereafter began a campaign of retaliation
12  against those DDAs who supported or participated in union activities.
13  On October 17, 2008, Steve Cooley met with veteran prosecutor, Robert
14  Dver, and told him that ADDA President Steve Ipsen was a "crook," and
15  that all prosecutors who signed union cards were "contaminated." Mr.
16  Cooley instructed Robert Dver to "undermine" the ADDA. When Mr. Dver
17  refused to do so, he was transferred and stripped of his supervisory
18  tasks.

19     16. Jacquelyn Lacey warned Mr. Dver not to join ADDA's contract
20  negotiating team and not to even discuss ADDA matters with Steve
21  Cooley as it would negatively impact his career. She also stated that
22  being associated with ADDA would "definitely" hurt Dver's career.

23     17. The President of ADDA, Steven Ipsen, was retaliated against
24  because of his association with ADDA. Steve Ipsen had consistently
25  received "Outstanding" performance evaluations during his twenty year
26  career. After he elicited damaging testimony from Jacqueline Lacey on
27  July 9, 2009, during an ERCOM hearing regarding Steve Cooley's alleged
28  interference with union activities and participation, Mr. Ipsen

FIRST AMENDED COMPLAINT

received an unwarranted rating of "Needs Improvement" on his performance evaluation on July 14, 2009.

18. ADDA's Vice-President, Marc Debbaudt, was also retaliated against for his support of the ADDA and for drafting an ERCOM anti-union complaint against the DA's office. Mr. Debbaudt had been a prosecutor in the DA's office for over 20 years and, until ADDA's certification in 2008, all of his performance evaluations had been rated as "Outstanding." In September of 2008, Mr. Debbaudt, a Grade IV DDA, was transferred to an entry-level assignment in Pomona Juvenile Court requiring an extremely long commute time. During Jacqueline Lacey's testimony given during the ERCOM hearing referred to in paragraph 17 above, she testified that Steve Cooley himself ordered Mr. Debbaudt's transfer and that such transfers were "infrequent." Indeed, Grade IV DDAs such as Debbaudt are never transferred to entry-level juvenile assignments.

19. Veteran prosecutor, Hyatt Seligman, was also retaliated against because of his association with ADDA. Mr. Seligman is an ADDA board member with over 30 years of experience in the DA's office. Mr. Seligman is one of the state's foremost experts on the use of mental defenses in criminal prosecutions and he, along with Robert Dver, served in the Training Division of the DA's office for over a decade and personally trained hundreds of deputy prosecutors who are currently in office. During a bargaining session on March 17, 2009, between the ADDA and the County of Los Angeles, Mr. Seligman questioned the punitive transfers of prosecutors. Two days later, Mr. Seligman was himself punitively transferred, was stripped of all training obligations of new DDAs, not given any cases relating to the area of his expertise, and his rating on his next performance

1  evaluation was two levels lower than it had ever been before.

2      20. In furtherance of the County's and Steve Cooley's plan to

3  frustrate union activities, in September of 2009, the defendant

4  notified all County employees that they were reducing health benefit

5  monthly fees for its employees with the exception of ADDA members.

6  This carving out of ADDA members from the reduction of health benefit

7  fees was a transparent retaliatory move to chill DDAs participation

8  in, and support of, the ADDA and violated <u>Government Code</u> §3504.5(c).

9      21. The County of Los Angeles' unfair and malicious attitude

10 regarding ADDA became clearer when in December of 2008 it pretended to

11 participate in contract negotiations with the ADDA, when its

12 negotiators only had authority to "prolong negotiations." All

13 purported negotiations between the County of Los Angeles and the ADDA

14 were futile and, on the part of the County of Los Angeles, done in bad

15 faith.

16     22. Based on the above facts, on or about March 2, 2010, the

17 federal court issued a preliminary injunction against Defendant Cooley

18 and his senior administration officials from taking further adverse

19 employment actions against members of the ADDA in the action, *Unnamed*

20 *Deputy District Attorney v. County of Los Angeles,* USDC Case No. CV

21 09-7931 ODW. A true and correct copy of the Order Granting Plaintiffs'

22 Motion for Preliminary Injunction is attached hereto as Exhibit 2 and

23 incorporated herein by reference. The Court specifically found in that

24 action that the Plaintiffs were likely to succeed on their claims.

25 (See Exhibit 1, p. 11, ll. 1-5).

26     **Facts Relating Specifically To Plaintiff's Employment.**

27     23. Plaintiff was hired by Defendants as a Deputy District

28 Attorney ("DDA") Grade I on or about March 9, 2008.

FIRST AMENDED COMPLAINT

24. Sometime around Plaintiff's first month of employment as a DDA, Plaintiff attended an employment meeting at which Steve Cooley was present. Plaintiff asked Steve Cooley questions about the formation of a union; Mr. Cooley's response was to give him a "dirty look." This exchange was seen by the other first year DDAs present at the meeting and served to chill their participation in same. At least one first year DDA, who was hired at or near the same time as Plaintiff, refrained from joining the union for fear of retaliation, telling Steve Ipsen (the President of ADDA) in 2010 that he/she saw what happened to Plaintiff (i.e. that he was terminated) after he asked Steve Cooley questions about the union at the meeting described above.

25. At a union meeting that Plaintiff attended near the beginning of his employment, several of the DDA's who were training the new DDA's saw Plaintiff speaking with Steven Ipsen, a vocal advocate for the union and the President of the ADDA. At that time, several of these DDA's in charge of training made comments to Plaintiff that associating with Ipsen was "not a good idea."

26. During Plaintiff's employment as a DDA, plaintiff associated with several more senior DDA's, one of whom was John Harold. Plaintiff was told by other DDA's on several occasions during his employment that Plaintiff would be wise to avoid associating with Mr. Harold who was a member of the ADDA, an Alternate Executive Committee Board Member of the ADDA, and who himself had been retaliated against for his support of the ADDA.

27. On or about October 16, 2008, Defendant Steve Cooley's agents, including Peter Burke, unlawfully obtained signature cards and/or other documents containing the names of DDA's who signed cards

FIRST AMENDED COMPLAINT

1  or documents indicating their support for the formation and
2  certification of the ADDA. A true and correct copy of the Declaration
3  of Paul Raymond Causey is attached hereto as Exhibit 3 and
4  incorporated herein by reference. Said cards and/or other documents
5  later came into the possession of Steve Cooley. Plaintiff's name
6  appears on said cards and/or other documents as he had signed a union
7  card in approximately March of 2008. In accordance with Steve Cooley's
8  determination that prosecutors like Plaintiff that signed such
9  documents were "contaminated," (See Exhibit 1, p. 2, l. 18), and in
10 accordance with Steve Cooley's instructions to his underlings to
11 "undermine" the ADDA, (See Exhibit 1, p. 2, l. 20), the Defendants
12 made sure that Plaintiff's employment would not continue regardless of
13 his work performance because he (Plaintiff) was an ADDA supporter.

14     28. During a DDA's first year, they are given two three-month
15 rotations and one six-month rotation in various Los Angeles County
16 Courthouses. During each of the three rotations, Grade I DDA's are
17 provided with performance evaluations several weeks prior to the end
18 of each rotation. During plaintiff's three rotations, he received
19 favorable work reviews for each rotation. A true and correct copy of
20 Plaintiff's July 9, 2008, performance evaluation from the El Monte
21 DA's Office is attached as Exhibit 4 and incorporated herein by
22 reference. A true and correct copy of Plaintiff's October 14, 2008,
23 performance evaluation from the Downey DA's Office is attached as
24 Exhibit 5 and incorporated herein by reference. A true and correct
25 copy of Plaintiff's January 9, 2009, performance evaluation is
26 attached as Exhibit 6 and incorporated herein by reference.

27     29. Plaintiff's fourth and final assignment was a rotation at the
28 Downtown Los Angeles District Attorney's office. Plaintiff was

9

1  assigned to felony preliminary hearings. Plaintiff held approximately

2  150 felony preliminary hearings to answer and his court ran smoothly

3  for the approximately 10-week period he was assigned there.

4      30. On March 9, 2009, plaintiff was given a final "composite

5  review," which was to be a composite of Plaintiff's prior performance

6  evaluations over the previous ten (10) months of employment. Despite

7  Plaintiff's past positive performance, Plaintiff was given an

8  unfavorable composite review, in direct contradiction to the previous

9  performance reviews. A true and correct copy of Plaintiff's March 9,

10  2009, Report on Probationer-Attorney is attached as Exhibit 7 and

11  incorporated herein by reference. At that time, defendant indicated

12  that Plaintiff would not be approved for final and complete

13  appointment due to Plaintiff's inadequate job performance (despite it

14  having actually been competent) and Plaintiff was given the option to

15  either be terminated, at which point the unfavorable report on him

16  would be placed in his personnel file, or to resign, at which point

17  the negative report would be destroyed so as not to negatively affect

18  Plaintiff's future job prospects. Plaintiff refused to sign the report

19  and was constructively terminated on March 9, 2009.

20

21              **FIRST CAUSE OF ACTION**

22      **(Violation of U.S. Constitution, Amendment I - Freedom of**

23      **Association, Against All Defendants)**

24      31. Plaintiff realleges paragraphs 1 through 30 above and

25  incorporates the same herein by reference as though set forth herein

26  at length.

27      32. Plaintiff has a constitutional right to freedom of

28  association in relation to Plaintiff's decision to sign a document

10

1 | that indicated support for the formation and certification of ADDA.

2 | 33. Plaintiff alleges that the facts set forth above show that
3 | Defendants instituted a union discrimination policy that violated
4 | Plaintiff's right to freedom of association guaranteed by the First
5 | Amendment to the United States Constitution, made applicable to state
6 | and local governments through the Due Process Clause of the Fourteenth
7 | Amendment.

8 | 34. As a direct result of Defendants' violation of Plaintiff's
9 | right to freedom of association, Plaintiff suffered special and
10 | general damages in an amount according to proof.

11 | 35. The acts of the individual defendants as herein alleged, were
12 | wilful, wanton, malicious, and oppressive, and justify the awarding of
13 | punitive damages.

14 |

15 | **SECOND CAUSE OF ACTION**

16 | **(Violation of U.S. Constitution, Amendment I – Freedom of Speech)**

17 | **(On Behalf of Plaintiff Against All Defendants)**

18 | 36. Plaintiff realleges paragraphs 1 through 30 above and
19 | incorporates the same herein by reference as though set forth herein
20 | at length.

21 | 37. Plaintiff has a constitutional right to freedom of speech in
22 | relation to Plaintiff's decision to sign a document that indicated
23 | support for the formation and certification of ADDA.

24 | 38. Plaintiff alleges that the facts set forth above show that
25 | Defendants instituted a union discrimination policy that violated
26 | Plaintiff's right of freedom of speech guaranteed by the First
27 | Amendment to the United States Constitution, made applicable to state
28 | and local governments through the Due Process Clause of the Fourteenth

1  Amendment.

2      39. As a direct result of Defendants' violation of Plaintiff's

3  right to freedom of speech, Plaintiff suffered special and general

4  damages in an amount according to proof.

5      40. The acts of the individual defendants as herein alleged, were

6  wilful, wanton, malicious, and oppressive, and justify the awarding of

7  punitive damages.

8      **WHEREFORE,** Plaintiff prays for judgment in his favor against the

9  Defendants, and each of them, as follows:

10      1. For an award of costs and expenses, including reasonable

11  attorneys' fees, pursuant to 42 U.S.C. § 1988, and any other

12  applicable law;

13      2. For an award of special and general compensatory damages;

14      3. For an award of punitive damages (against all individual

15  defendants only);

16      4. For such other and further relief as the Court deems equitable

17  and proper.

18

19                        **REQUEST FOR JURY TRIAL**

20      Plaintiff requests a jury trial for all issues so triable.

21

22

23  Dated: March 23, 2011                    /s/
                                    _____
                                    Michael F. Sisson, Attorney for
24                                  plaintiff, Jeremy A. Moore

25

26

27

28

FIRST AMENDED COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT 1**

FIRST AMENDED COMPLAINT

O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| ONE UNNAMED DEPUTY DISTRICT ATTORNEY, et al. | CASE NO. CV 09-7931 ODW (SSx) |
| Plaintiffs, | ORDER GRANTING ADDA'S MOTION TO CERTIFY CLASS [123] |
| vs. | |
| COUNTY OF LOS ANGELES, et al., | |
| Defendants. | |

**INTRODUCTION**

The Association of Deputy District Attorneys (the "ADDA") moves to certify a class of Los Angeles County deputy district attorneys in Grades I through IV who signed "union cards" between December 2007 and February 2008 indicating their desire to unionize. The ADDA contends putative class members suffered various constitutional violations when Defendant Peter Burke disclosed to management a list of deputy district attorneys who had signed union cards. (Mot. at 1.)

The ADDA previously moved for a preliminary injunction based on the same facts at issue here, which this Court granted on March 2, 2010. As all concerned parties are thus familiar with the facts of this case, the Court dispenses with such a superfluous recitation and proceeds to the merits of the ADDA's motion.

## DISCUSSION

### A.   Legal Standard: Class Certification

Rule 23(a) provides that class certification is appropriate only where "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a); *see also Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 613 (1997). In addition to satisfying Rule 23(a)'s prerequisites, a party seeking class certification must show that the action is maintainable under Rule 23(b)(1), (2), or (3). *Id.* at 614.

"In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974) (internal quotations omitted); *see also Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d 571, 586 (9th Cir. 2010) (courts should not "put the actual resolution of the merits cart before the motion to dismiss, summary judgment, and trial horses by reaching out to decide issues unnecessary to the Rule 23 requirements").

### B.   Standing

Before proceeding to the parties' certification arguments, the Court will first examine Defendants' contention that the ADDA lacks standing to represent the prospective class. Defendants first argue the "ADDA lacks standing to raise claims on behalf of the proposed class because the class is comprised largely of individuals who are not ADDA members." (Opp'n at 7) (although the ADDA contemplates a class of 540 members, the ADDA actually includes only about 300 members) (citations omitted). The proposed class thus includes at least 240 individuals who are not ADDA members, which, according to Defendants, precludes the ADDA from being an appropriate class representative with regard to such individuals. (Id.)

2

1      The ADDA contends this argument lacks merit. First, "federal courts have expressly
2  permitted unions to serve as class representatives of employee classes that include
3  non-union employees." (Reply at 8) (citing *Clark Equip. Co. v. Int'l Union, Allied Indus.*
4  *Workers of Am., AFL-CIO*, 803 F.2d 878, 880 (6th Cir. 1986) ("Unions have standing to
5  represent a class, even if the union itself alleges no specific injury. [Citation.] The fact that
6  the union represented non-union employees [ ] does not mandate a different result.").
7  Second, "every member of the proposed class in this matter belongs to the bargaining unit
8  represented by ADDA, thereby imposing upon ADDA a *legal duty* to fairly represent all
9  of them in contract negotiations." (Reply at 8) (emphasis in original) (citing *Hussey v.*
10  *Operating Eng'r Local Union No.3*, 35 Cal. App. 4th 1213, 1219 (1995) (applying federal
11  duty of fair representation to state employees unions because state law, like federal law
12  permits "a single labor organization to represent collectively the interests of all employees
13  within a unit").

14      Defendants next argue that, "even as to members of the proposed class who are
15  union members, ADDA lacks standing to raise the purported class claims for *damages*."
16  (Opp'n at 7) (emphasis in original).   The ADDA proposes "a simple solution"
17  contemplated by Rule 23(c)(4). (Reply at 2.) Specifically, the ADDA invites the Court to
18  certify a class limited to discrete issues of liability. (Id.) The Court accepts the ADDA's
19  invitation and will review the propriety of certification as to liability only.

20      C.   Plaintiffs' Motion to Certify Class

21      The ADDA proposes to certify the following class:

22  Los Angeles County Deputy District Attorneys in Grades I through IV during
    the period from December 2007 to February 2008 who signed union cards
23  demonstrating their desire to become unionized employees.

24  (Mot at 5.) The ADDA argues the Court should certify the class because it satisfies the
25  requirements of Rule 23(a), as well as 23(b)(2) and 23(b)(3).   The Court begins by
26  examining the criteria enumerated in Rule 23(a).

27

28

### *Numerosity*

Numerosity needs not detain us because a putative class of 540 members easily satisfies Rule 23(a)(1), as would the class of 300 members which Defendants envision. (*See* Opp'n at 7.) *See also Gay v. Waiters' and Dairy Lunchmen's Union*, 549 F.2d 1330, 1332 n.7 (9th Cir. 1977) (110 is "clearly a sufficient number" for Rule 23(a)(1)).

### *Commonality*

Commonality focuses on the relationship of common facts and legal issues among class members. *Dukes*, 603 F.3d at 599 (citations omitted); *see also* Fed. R. Civ. P. 23(a)(2) (requiring "questions of law or fact common to the class"). "The commonality test is 'qualitative rather than quantitative'-one significant issue common to the class may be sufficient to warrant certification." *Dukes*, 603 F.3d at 599 (citation omitted). As the Ninth Circuit observed:

> Rule 23(a)(2) has been construed permissively. All questions of fact and law need not be common to satisfy the rule. The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class.

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998). "The commonality preconditions of Rule 23(a)(2) are [thus] less rigorous than the companion [typicality] requirements of Rule 23(b)(3)." *Id.*

The ADDA rightly argues that both the legal theories and factual allegations underlying their Eighth and Ninth Claims apply with equal force to the entire proposed class. (Mot. at 10.) The Eighth Claim involves Defendants' alleged violation of the putative class Plaintiffs' right to informational privacy as guaranteed by the Due Process Clause of the Fourteenth Amendment. The Ninth Claim involves Defendant's violation of the First Amendment, and is based on the same factual bases underlying the Eighth Claim - Defendants' dissemination of a list containing the identities of deputy district attorneys who expressed their desire to unionize. (*See* Mot. at 7-10.) It was thus a single incident which allegedly caused similar harm to similarly situated deputy district attorneys. Simply put, common questions of fact and law abound.

4

Defendants argue commonality is not satisfied because, as to the Eighth Claim, "any analysis of whether the disclosure of private information violates the constitutional right of privacy depends in part on the plaintiff's interest in denying access to that information, *Nelson v. Nat'l Aeronatics & Space Admin.*, 530 F.3d 865, 877 (9th Cir. 2008) [*rev'd* -- S. Ct. --; 2011 WL 148254 (2011)], and the plaintiff's expectation of privacy in the information. *Norman-Bloodsaw v. Lawrence Berkeley Lab.*, 135 F.3d 1260, 1269 (9th Cir. 1998)." (Opp'n at 11.) Thus, according to Defendants, "any analysis of whether class plaintiffs' claimed privacy rights were violated by the disclosure of the list and the alleged 'outing' of plaintiffs as union supporters necessarily would involve a highly individualized inquiry as to whether plaintiffs in fact treated that information as confidential." (Id.)

Curiously, Defendants do not elucidate their argument in light of their claimed authority, which do not in fact mandate such individualized inquiries. To the extent such factual inquiries are required, however, it would actually appear that, because the prospective class members are so similarly situated, class-wide treatment of such issues is not only warranted, but advisable. (*See id.* at 12-13.) The prospective class members, after all, are all similarly-situated prosecutors who faced the very same alleged violations.

Defendants acknowledge the Ninth Circuit has held that a plaintiff's First Amendment rights are violated when government acts in a manner that would chill a "person of ordinary firmness" from future First Amendment activities. (Opp'n at 12.) Defendants insist, however, that the Ninth Circuit "has never held that a plaintiff's individual situation is otherwise irrelevant to the issue of whether his or her rights have been chilled." (Id. at 13.) But, while this Court is guided by higher courts' silence as it is by their mandates, Defendants' argument simply fails to rebut the ADDA's commonality showing. And, although "a plaintiff's individual situation" might not be entirely irrelevant, (*see* Opp'n at 13), nor does it preclude a finding of commonality, especially when that requirement is construed permissively, as the Ninth Circuit expressly noted. *See Hanlon*, 150 F.3d at 1019 ("Rule 23(a)(2) has been construed permissively.").

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

***Typicality***

Defendants challenge typicality only as it relates to the ADDA's standing. (*See* Opp'n at 10) ("Insofar as ADDA lacks standing to assert the claims of the class, ADDA cannot show that its claims are typical of those claims."). Given the Court's finding that the ADDA does have standing, it follows that Defendants' argument here must fail.

***Adequacy of Representation***

Defendants do not oppose certification on this ground, and the Court finds that the ADDA will fairly and adequately represent the interests of the class.

***23(b)(3)***

To qualify for certification under this subsection, a class must satisfy two conditions in addition to the Rule 23(a) prerequisites: common questions must "predominate over any questions affecting only individual members," and class resolution must be "superior to other available methods for the fair and efficient adjudication of the controversy." *Hanlon*, 150 F.3d at 1022 (quoting Fed. R. Civ. P. 23(b)(3)).

*Predominance*

Rule 23(b)(3) requires that "[common] questions of law or fact ... predominate over any questions affecting only individual members." The inquiry presumes the existence of common questions of fact or law and focuses instead on "the balance between individual and common issues." *In re Wells Fargo Mortgage Overtime Pay Litigation*, 571 F.3d 953, 959 (9th Cir. 2009); *see also Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997) ("The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.").

The ADDA recognizes that the predominance requirement in Rule 23(b)(3) is "far more demanding than the commonality requirement of Rule 23(a)(2)." (Mot. at 16) (quoting *Amchem Prods., Inc.*, 521 U.S. at 623-24. Nevertheless, argues the ADDA, "not only do common questions predominate over individual issues in this action, it is fair to say that Plaintiffs' class claims consist almost entirely of common questions." (Id.)

1    Defendants disagree, arguing, "[w]ith regard to plaintiffs' Eighth Cause of Action,

2    the core issue of whether the disclosure of the list violated class plaintiffs' privacy rights

3    would require individualized proof because, as demonstrated above, the extent to which

4    plaintiffs might be able to claim a constitutionally protected privacy interest (if any) in the

5    fact that they signed union cards necessarily would vary from plaintiff to plaintiff." (Opp'n

6    at 18-19.)   Defendants raised this very objection in challenging the commonality

7    requirement of Rule 23(a)(2).

8    Again, while some individualized questions might arise in this litigation, common

9    questions of fact and law easily and substantially predominate over questions affecting only

10   individual members of the class.  The same holds true for plaintiffs' Ninth Claim under the

11   First Amendment, notwithstanding Defendants' interesting reading of the Ninth Circuit's

12   "person of ordinary firmness" standard for assessing claims under the First Amendment.

13   (*See* Opp'n at 12.)   Finally, the Court will not address Defendants' arguments as to

14   individualized inquiries concerning damages because, as stated above, this certification

15   analysis concerns only the issue liability.

16   *Superiority*

17   "Rule 23(b)(3)'s superiority test requires the court to determine whether maintenance

18   of this litigation as a class action is efficient and whether it is fair. This analysis is related

19   to the commonality test. Underlying both tests is a concern for judicial economy." *Wolin*

20   *v. Jaguar Land Rover N. Am.*, LLC, 617 F.3d 1168, 1175-76 (9th Cir. 2010) ("Where

21   recovery on an individual basis would be dwarfed by the cost of litigating on an individual

22   basis, this factor weighs in favor of class certification.").

23   The factors relevant to superiority include "(A) the class members' interests in

24   individually controlling the prosecution or defense of separate actions; (B) the extent and

25   nature of any litigation [ ] already begun by or against class members; (C) the desirability

26   or undesirability of concentrating the litigation of the claims in the particular forum; and

27   (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(A-D).

28

As to the first factor, none of the putative class members have expressed any interest in individually controlling the prosecution of separate actions. Indeed, the nature of this litigation, and looming threat of retaliation, is likely to dissuade individual class members from vindicating their constitutional rights. The second factor also favors certification because no litigation involving class members has been commenced, at least not to this Court's knowledge. Third, it is quite desirable to concentrate the litigation in this forum because all putative class members (and Defendants) reside herein. And finally, aside from some factual inquiries that *might* be individualized, the difficulty in managing the class is nevertheless far superior to separate actions, especially given the disinclination of class members to paint themselves a bigger target by individually seeking redress.

## CONCLUSION

The ADDA has met the requirements of Rule 23(a) and 23(b)(3) for certifying a class. Accordingly, the ADDA's motion to certify a class as to liability is **GRANTED**. Should facts later emerge which so require, this class may be decertified. *See Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982) ("Even after a certification order is entered, the judge remains free to modify it in [ ] light of subsequent developments in the litigation."); *see also Dukes*, 603 F.3d at 579 ("If evidence not available at the time of certification disproves Plaintiffs' contentions that common issues predominate, the district court has the authority to modify or even decertify the class ... or use a variety of management devices to address the individualized issues that have arisen).

**SO ORDERED**

January 24, 2011

OTIS D. WRIGHT II
UNITED STATES DISTRICT JUDGE

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT 2**

14

O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| ONE UNNAMED DEPUTY DISTRICT ATTORNEY, et al. )<br><br>          Plaintiffs, )<br><br>vs. )<br><br>COUNTY OF LOS ANGELES, et al., )<br><br>          Defendants. ) | CASE NO. CV 09-7931 ODW (SSx)<br><br>ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION |

## I.   INTRODUCTORY BACKGROUND

The Association of Deputy District Attorneys ("ADDA") is an employee organization formed through procedures established by Los Angeles County's Employee Relations Ordinance. (Compl. ¶ 8; Answer ¶ 8.)  Along with an unnamed deputy district attorney, the ADDA brings this action to protect Plaintiffs' "First Amendment rights of speech and association to engage in union-related activities without being subjected to Defendants' policy of discrimination and intimidation." (Compl. ¶ 5.) Among other things, Plaintiffs allege that Defendants punitively transferred several deputy district attorneys associated with ADDA, demoted them, awarded them undeserved, mediocre performance reviews and otherwise discriminated against them.

The ADDA's certification as a union began with employees returning union cards indicating their desire to unionize. (Mot. at 2.) "When ADDA supporters were collecting union cards in early 2008, ADDA Board Member Frank Tavelman asked Assistant District Attorney Jacquelyn Lacey, one of the top officials in the DA's Office, to issue a memorandum to all prosecutors stating the DA's office would be neutral regarding union organization and would refrain from retaliating against any prosecutor for exercising his or her right to join ADDA." (Id.) (citing Tavelman Decl., Exh. 1 ¶ 3)). Lacey informed Tavelman that Defendants would not comply with this request. (Exh. 1 ¶ 4.) Despite the lack of any promise by the DA's office to remain neutral, enough prosecutors returned union cards to the Los Angeles County Employee Relations Commission ("ERCOM") to certify ADDA as a county employees union on March 24, 2008. (Id.) (citing Compl. ¶¶ 8, 16; Answer, ¶¶ 8, 16). ADDA is now the representative of Bargaining Unit 801, which consists of approximately 1000 deputy district attorneys in Grades I through IV. (Id.) (citing Exh. 2 ¶ 17).

"On October 17, 2008, District Attorney Steve Cooley ["Cooley"] met with Robert Dver, a prosecutor with 24 years of experience in the DA's Office." (Id.) During that meeting, Cooley told Dver that ADDA President Steve Ipsen was a "crook," and that the prosecutors who signed union cards leading to ADDA's certification were "contaminated." (Id.) Plaintiffs also allege, and Defendants do not dispute that Cooley instructed Dver to "undermine" the ADDA. (Id. at 2-3.) After Dver refused to follow Cooley's directions, "Cooley transferred Dver and stripped him of his supervisory tasks." (Id. at 3) (citing Exhibit 3, pp. 23-24)). One of Cooley's top officials, Assistant District Attorney Jacquelyn Lacey, corroborated Dver's testimony, admitted to warning Dver not to join ADDA's contract negotiating team and not to even discuss ADDA matters with Cooley, as it would negatively impact his career. (Id.) (citing Exh. 4.) Lacey also provided that being associated with ADDA would "definitely" hurt Dver's career. (Id.)

2

Defendants also subjected other ADDA Board Members to forced transfers and other forms of retaliation for their union activities. Steve Ipsen, the president of ADDA, who had consistently received "Outstanding" performance evaluations during his twenty-year career, was suspended without pay for two days following a meeting with an Inglewood supervisor concerning mistreatment of a deputy district attorney, whose contested demotion was rescinded by Defendants due to an unfair performance evaluation. (Mot. at 4) (citations omitted). Ipsen was then transferred to Compton and, after he elicited damaging testimony from Lacey during an ERCOM hearing, he was issued a rating of "Needs Improvement" on his performance evaluation. (Mot at 4) (citing Exh. 2 ¶ 29.) "This rating was based substantially on the Inglewood supervisor's allegations relating to Ipsen's intervention in December 2008 on behalf of the young prosecutor that the Inglewood supervisor had falsely maligned." (Id) (citing Exh. 2 ¶ 29.) "None of the other 1000 deputy district attorneys received such a rebuke during 2009." (Id.)

ADDA's Vice President Marc Debbaudt has been a prosecutor in the DA's office for over 20 years and, until ADDA's certification in 2008, all of his performance evaluations had been "Outstanding." (Mot at 5) (citing Exh. 5 ¶ 4.) His supervisor described him as the "best calendar deputy I have ever seen in the office." (Id.) (citations omitted). "In September 2008 Defendants transferred Debbaudt for his role in drafting an ERCOM complaint as well as for other acts taken in his capacity as an ADDA member." (Id. at 6.) Lacey admitted that Defendants first decided to transfer Debbaudt to an entry-level position in the Eastlake Juvenile Court, but later revised their plan and transferred Debbaudt to an entry-level assignment in Pomona Juvenile Court, which required a much longer commute. (Id) (citations omitted). Lacey explained that Cooley himself ordered Debbaudt's transfer and that such orders were "infrequent." (Id.) ("In fact, Grade IV deputy district attorneys such as Debbaudt are never transferred to entry-level juvenile assignments."). Debbaudt was transferred to yet another entry-level assignment and, for the first time, his evaluations dropped below "Outstanding." (Id.)

3

Hyatt Seligman is another ADDA Board Member with over 30 years of experience in the DA's office. (Id.) (citing Seligman Decl. Exh. 6 ¶ 2.) He has received glowing evaluations throughout his career and is one of the state's foremost experts on the use of mental defenses in criminal prosecutions. (Id.) (citations omitted). Two days after questioning defendants about "punitive transfers of prosecutors" during a bargaining session between ADDA and Defendants, Seligman was transferred to the Long Beach Courthouse. (Id. at 7.) "Defendants' transfers of Seligman and Dver from the Training Division [ ] ensured that no active ADDA members remain in the Training Division." (Id.) (citing Exh. 6 ¶ 22).. Seligman's supervisor at the Training Division from which he was transferred was upset at the move and his new supervisor in Long Beach did not need him or have any office space for him, but attempted to somehow accommodate him. (Id.) After his transfer to Long Beach, Seligman received a rating of "Met Expectations" from his supervisor, which was two levels below the "Outstanding" ratings Seligman had previously received throughout his career. (Id) (citations omitted). "When Seligman asked [his supervisor] about the [evaluation], [the supervisor] explained that a 'Met Expectations' rating was the highest rating he was allowed to give to Seligman and, if he had given a higher rating, Defendants would have 'kicked it back' [to the supervisor] and made him revise it." (Id. at 7-8) (citations omitted).

ADDA commenced contract negotiations with Defendants in December 2008 for its first collective bargaining agreement, but filed "an unfair labor practices charge with ERCOM on May 13, 2009" after it became clear that Defendants' negotiators had only authority to prolong negotiations. (Id. at 8) (citations omitted). In September 2009, Defendants informed all County employees of a substantial increase in monthly fees for the County's health benefit plans for 2010, but explained in October 2009 that they were reducing those costs. (Id. at 8-9) (citations omitted). "The October 2009 notice also contained a paragraph notifying ADDA members that they were *excluded* from the County's reduced rate structure." (Id.) (citation omitted) (emphasis in original).

4

1    Defendants admit that the "difference in treatment is between all the employees in

2    the ADDA bargaining unit versus County employees who are not represented by a union."

3    (Opp'n at 6.)  They contend, however, without citation to authority, that certain "statutes

4    and rules regarding labor negotiations require the County not" to alter an employee's

5    benefits based on whether that employee is represented by a union. (Id. at 2.)  Defendants'

6    argument, and Plaintiffs' other allegations, shall be further discussed below as necessary.

7    ## II.   DISCUSSION

8       ### A.   Legal Standard: Preliminary Injunction

9       "A plaintiff seeking a preliminary injunction must establish that he is likely to

10   succeed on the merits, that he is likely to suffer irreparable harm in the absence of

11   preliminary relief, that the balance of equities tips in his favor, and that an injunction is in

12   the public interest." *Am. Trucking Ass'n, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052

13   (9th Cir.2009) (quoting *Winter v. Natural Res. Def. Council*, --- U.S. ----, 129 S. Ct. 365,

14   374 (2008)).   While Plaintiffs bear the burden of establishing their entitlement to the

15   requested relief, the "court may [] consider hearsay in deciding whether to issue a

16   preliminary injunction." *Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009) (citing

17   *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1363 (9th Cir.1988) (en banc)); *see*

18   *also Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir.1984) ("The district court

19   may give even inadmissible evidence some weight, when to do so serves the purpose of

20   preventing irreparable harm before trial.").

21      ### B.   Plaintiffs' Motion for Preliminary Injunction

22      Plaintiffs seek a preliminary injunction prohibiting Defendants from discriminating

23   or otherwise taking adverse employment actions against deputy district attorneys based

24   upon their union status.  Plaintiffs' request is premised on  Defendants' alleged violations

25   of their First Amendment rights and their rights to equal protection under the Fourteenth

26   Amendment.  Establishing a likelihood of success as to either claim is sufficient to satisfy

27   Plaintiffs' burden under the first  prong of the preliminary injunction inquiry.

28

*Likelihood of Success*

The supreme Court has "long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). Such "protected First Amendment rights flow to unions. . .." *Allee v. Medrano*, 416 U.S. 802, 820 n.13 (1974). "If, as alleged by the union in its complaint, its members were subject to unlawful [actions] and intimidation for engaging in union organizational activity protected by the First Amendment, the union's capacity to communicate is unlawfully impeded, since the union can act only through its members." *Id.* As Plaintiffs point out, moreover, the "threat of sanctions may deter [the exercise of First Amendment freedoms] almost as potently as the actual application of sanctions." (Mot. at 12) (quoting *N.A.A.C.P. v. Button*, 371 U.S. 315, 433 (1963)). Government actions may unconstitutionally infringe upon this associational freedom through various forms. "Among other things, government may seek to impose penalties or withhold benefits from individuals because of their membership in a disfavored group." *Roberts*, 468 U.S. at 622-23.

Here, Plaintiffs have alleged several violations of their First Amendment rights, which are largely undisputed by Defendants. Defendants do not deny, for example, that Cooley instructed Robert Dver to "undermine" or otherwise interfere with the union. Nor do they dispute that Cooley demoted Dver when he refused to do so. Similarly undisputed is Lacey's admission that being associated with ADDA would "definitely" hurt one's career so far as Cooley was concerned. Such actions unquestionably interfere with the union's function and chill the free exercise of Plaintiffs' First Amendment rights. *See, e.g., Coszalter v. City of Salem*, 320 F.3d 968, 974-75 (9th Cir. 2003) ("The precise nature of the retaliation is not critical to the inquiry in First Amendment retaliation cases. The goal is to prevent, or redress, actions by a government employer that 'chill the exercise of protected' First Amendment rights.") (citation omitted).

Nevertheless, Plaintiffs have established a course of explicit retaliation by Defendants that is both striking and rampant. The habitual transfers of ADDA organizers cannot be excused, as Defendants contend, by reliance on John K. Spillane's declaration that the transfers fall "within the written policy of the District Attorney's office, and that none of them were done for the purpose of retaliating for union activity." (Opp'n at 8.) Even a proper procedure, after all, can be employed to accomplish an improper purpose. The extent, timing and impact of such transfers evince such a purpose in this case.

Steve Ipsen, the president of ADDA, was transferred to the Inglewood Courthouse shortly after he investigated a complaint by a Lancaster deputy district attorney who was unfairly treated "for seeking to disclose exculpatory evidence to a defense attorney as required under *Brady v. Maryland*, 373 U.S. 83 (1963)." (Mot. at 4) (citation omitted). And, after Ipsen helped achieve the rescission of a deputy's questionable demotion at his new location, he was transferred again, this time to the Compton Courthouse. (Id.)

ADDA's Vice President Marc Debbaudt was "transferred [ ] for his role in drafting an ERCOM complaint as well as for other acts taken in his capacity as an ADDA member." (Mot. at 6.) As Lacey admitted, Defendants first decided to transfer Debbaudt to an entry-level position in the Eastlake Juvenile Court, but later revised their plan and transferred him to an entry-level assignment in Pomona Juvenile Court, which required a much longer commute. (Id.) (citations omitted). According to Lacey, Cooley himself ordered Debbaudt's transfer, noting that such orders were "infrequent." (Id.)

ADDA Board Member Hyatt Seligman was transferred two days after questioning Defendants about "punitive transfers of prosecutors" during a bargaining session between ADDA and Defendants. (Id. at 7.) Robert Dver was warned by Lacey that being associated with ADDA would "definitely" hurt his career, and was later transferred after he refused Cooley's instruction to undermine ADDA. "Defendants' transfers of Seligman and Dver from the Training Division [ ] ensured that no active ADDA members remain[ed] in the Training Division." (Mot. at 7) (citing Exh. 6 ¶ 22).

1      While the foregoing is but a sample of Defendants' actionable conduct, (*see* mot. at

2  2-10), it sufficiently establishes that Defendants have not only made it difficult for ADDA

3  to carry out its objectives, but have also deterred prospective members from joining the

4  union. "Indeed, several prosecutors have already said as much to ADDA Board Members."

5  (Reply at 2) (citing Exh. 2 ¶ 37).

6      Defendants argue these actions are not actionable because there was no reduction in

7  the transferred individuals' pay. (Opp'n at 8-10.) As Plaintiffs point out, however, this

8  argument misstates the law. (Reply at 3.) When based upon a retaliatory motive, as

9  Defendants' actions were, "a transfer to another job of the same pay and status may

10  constitute an adverse employment action." *Ray v. Henderson*, 217 F.3d 1234, 1241 (9th

11  Cir. 2000). And, the sole case cited by the Defendants, *Benach v. County of Los Angeles*,

12  149 Cal. App. 3d 836 (2007), "is not on point because the plaintiff in that action offered

13  no evidence [ ] showing his transfer was based upon improper motives." (Reply at 3.) In

14  any event, it cannot be said that the transfers were for a job of similar status where the

15  transferees were either stripped of their supervisory duties or otherwise demoted.

16      This brings us to the disparity in health care costs between unionized employees and

17  others. First, the fact that two other bargaining units face the same disparity as ADDA

18  does not somehow establish that the practice is proper, as Defendants suggest. As stated

19  above, secondly, Defendants *concede* that the "difference in treatment is between all [ ]

20  employees in the ADDA bargaining unit versus County employees who are not represented

21  by a union." (Opp'n at 6.) Defendants contend, however, this disparity is compelled by

22  certain "statutes and rules regarding labor negotiations." (Id. at 2.) Yet the statutes and

23  ordinances offered by Defendants do not support this contention, and their legal authority,

24  *Oakland Unified School Dist. v. Public Employment Relations Bd.*, 120 Cal. App. 3d 1007

25  (1981), is inapplicable. Absent such a valid and compelling directive, this Court finds that

26  such a disparity likely infringes upon Plaintiffs' associational freedom by seeking "to

27  impose penalties or withhold benefits from individuals because of their membership in a

28  disfavored group." *Roberts*, 468 U.S. at 622-23.

1   Indeed, contrary to Defendants' unsubstantiated assertions, the California Legislature

2   enacted a statute specifically *prohibiting* Los Angeles County from "discriminat[ing]

3   against employees by removing or disqualifying them from a health benefit plan, or

4   otherwise restricting their ability to participate in a health benefit plan, on the basis that the

5   employees have selected or supported a recognized employee organization." (Reply at 8)

6   (quoting Cal. Govt. Code § 3504.5(c)).

7   In sum, the Court finds that Plaintiffs' largely undisputed allegations sufficiently

8   establish their likelihood of success on their constitutional claims.

9   *Irreparable Harm*

10   "Unlike monetary injuries, constitutional violations [including the disparity in health

11   care costs] cannot be adequately remedied through damages and therefore generally

12   constitute irreparable harm." *Nelson v. National Aeronautics and Space Admin.*, 530 F.3d

13   865, 882 (9th Cir. 2008) (citation omitted); *see also Elrod v. Burns*, 427 U.S. 347, 373-74

14   (1976) ("The loss of First Amendment freedoms, for even minimal periods of time,

15   unquestionably constitutes irreparable injury.").

16   Even aside from the constitutional nature of Defendants' violations, Plaintiffs have

17   established a high likelihood of irreparable harm.  Defendants' far-reaching actions have

18   pushed the union to the brink and, as Plaintiffs point out, "ADDA's ability to recruit new

19   members, and retain current ones, has been severely strained by the pressures from

20   Defendants' harassment and intimidation." (Mot. at 21.)  Indeed, given the fear instilled

21   by Defendants, and the union hesitancy and defections resulting therefrom, it is very likely

22   that ADDA will not even exist by the time this action concludes. (*See* Mot. at 21-22) ("Not

23   surprisingly, Defendants[] . . . have reduced ADDA's membership and chilled the

24   enthusiasm of many of its remaining members.  Several non-ADDA members . . . have told

25   ADDA Board Members that they support ADDA's efforts and would be interested in

26   joining the union but will not do so because of fear of retaliation by Defendants.") (citation

27   omitted).  Plaintiffs thus clearly satisfy this prong of the preliminary injunction inquiry.

28

*Balance of Equities and Public Interest*

The balance of equities tips sharply in favor of Plaintiffs, who face an onslaught of retaliation and constitutional violations. Plaintiffs seek merely to exercise their First Amendment rights and perform their duties without harm or consternation. On the other side of the balance, Defendants cannot seriously suffer any harm if they are preliminarily enjoined from engaging in their questionable conduct; they need merely obey the law.

An injunction in this case also serves the public interest by protecting the constitutional principles underlying this very society. This is especially true where, as here, those officials entrusted with upholding those values could likely be found to have abrogated their duty. The public surely has a vested interest not only in abating such violations but also in ensuring that those responsible cease their abuse. (*See also* Mot. at 24) ("it is always in the public interest to protect First Amendment liberties") (quoting *Joelner v. Washington Park*, 378 F.3d 613, 620 (7th Cir. 2004)).

Before concluding, it bears emphasizing that, while the foregoing sufficiently establishes Plaintiffs' entitlement to a preliminary injunction, Defendants' abuses far exceed the specific examples illustrated above. (*See* Mot. at 2-10.) Plaintiffs' allegations are mostly undisputed, moreover, and Defendants offer no persuasive reason why Plaintiffs' arguments should not be sustained. Plaintiffs do offer some hearsay evidence in support of their motion but, as mentioned above, such evidence is acceptable at this juncture. And, to the extent Defendants object to the authentication of certain exhibits, such deficiencies are remedied by Plaintiffs' Reply documents. (*See* Reply at 2 n.2.)

Finally, the Court disagrees with Defendants' assertion that Plaintiffs' "proposed order regarding transfers is unworkably vague." (Opp'n at 12.) While the injunction only prohibits transfers made with an improper purpose, it would not be "virtually impossible to comply with." (Id.) The timing and nature of the transfers is quite telling, and this Court will carefully consider all relevant evidence should contempt proceedings ensue. Such a premature concern is simply no reason to deny the requested relief.

### III.   CONCLUSION and ORDER

Plaintiffs are likely to succeed on the merits of their claims, they will likely suffer irreparable harm absent injunctive relief, the balance of equities tips greatly in Plaintiffs' favor and an injunction is in the public interest.   Plaintiffs' motion for a preliminary injunction is therefore GRANTED.[1]

**IT IS HEREBY ORDERED** that Defendants, their officers, agents, servants, employees, or persons in active concert with any of them, are restrained and enjoined from discriminating or retaliating against members of the Association of Deputy District Attorneys on the basis of their membership in ADDA.   This Order includes, but is not limited to, a prohibition of punitive transfers, demotions, discriminatory distribution of benefits and discipline on the basis of membership in the ADDA.   Defendants are also enjoined and restrained from utilizing rates for medical or health benefit plans that are based upon a deputy district attorney's representation by ADDA.

This Order shall remain in full force and effect until such time as a final judgment has issued in this matter or until further order of this Court.

**IT IS SO ORDERED**

DATED: March 2, 2010

OTIS D. WRIGHT II
UNITED STATES DISTRICT JUDGE

---

[1] As discussed above, Defendants' evidentiary objections are overruled to the extent pertinent to the Court's decision. Defendants' timely objections to Plaintiffs' proposed order are also overruled, but Defendants' newly filed objections are disregarded as improper. (*See* Docket No. 36.) All other objections to the scope of the injunction are rejected, as the injunction aims to quell all discrimination and retaliation against ADDA members.  As to transfers, should contempt proceedings ensue, the Court will carefully review the parties' respective arguments in light of the nature and timing of the transfers, in conjunction with the identity and activities of the persons transferred. (*See* Opp'n at 12.) Defendants' concern that Plaintiffs will challenge every transfer is thus of no moment.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT 3**

## DECLARATION OF PAUL RAYMOND CAUSEY

I, Paul Raymond Causey declare under penalty of perjury as follows:

I am, and have been employed by the County of Los Angeles for the past two and one half years. My title is Executive Director, Employee Relations Commission (ERCOM). I am the chief administrator of ERCOM and in charge of its office staff.

I am an attorney licensed to practice law in the state of California, State Bar No. 41287. Before I took this job I practiced labor and employment law for 35 years in Los Angeles County.

Before I became employed by the County, the Association of Deputy District Attorneys (ADDA) filed a petition with ERCOM seeking to have ERCOM certify the ADDA as the exclusive representative of a unit of Deputy District Attorneys (DDAs), I, II, III, and IV, for purposes of collective bargaining. As part of my job duties, I am well familiar with this situation and the history of the petition being processed by ERCOM. After I came to work for the county the ADDA was ultimately certified by ERCOM as the exclusive representative of a unit consisting of the DDAs I, II, III, and IV.

The ADDA filed authorization cards, and a written summary list of the contents of the authorizations cards with ERCOM. The written list contained the names of DDAs I through IV, and *inter alia*, an indication of whether the person had signed a card authorizing the union to represent them. In the discharge of my job duties, I obtained a list from the County Auditor-Controller of all persons in the county employed in the positions of DDA I through IV. I then checked this County list against the authorization cards, and list, submitted by the Association and determined that a majority of the Employees on the County employee list had signed written authorization for the union to represent them.

ERCOM Rule 5.10(a) provides: "All elections ordered by the Commission shall be by secret ballot and conducted under supervision of the Commission." ERCOM Rule 5.30 provides that in lieu of an election, written authorization may be submitted by the union to ERCOM. In other words the written authorization described above, such as the list at issue here, serves in lieu of a secret ballot and must also be kept secret.

The written authorization cards, the written list furnished by the union, and the list which I obtained from the Auditor Controller are required not only by the Rules mentioned above, but by separate ERCOM policy and procedure to be held in the strictest confidence. ERCOM staff is prohibited by the Rules mentioned above, and by separate ERCOM policy and procedure from ever disclosing any of the information contained in these items or whether a person did or did not sign an authorization card. Thus, ERCOM may not give, or allow a copy of any of these items, to any member of the public, from letting the public look at them, or from orally informing anyone the contents of the lists, and from disclosing whether a person had or had not signed an

EXHIBIT 1,    P. 1

authorization card. In summary, under ERCOM policy, these and all similar documents along with their contents are to be held in the strictest confidence and never revealed to anyone.

The reasons for the policy are several fold:
Disclosing the fact that a person signed a union authorization card could subject the person to retaliation by management, which may include discipline up to and including termination under a pretense.

Disclosing that a person did not sign an authorization card could subject the person to retaliation such as being ostracized by fellow workers who were in favor of a union. Moreover, as some Supervisors are included in the DDA I-IV unit and may have signed authorization cards, the same kind of retaliation described above could be directed at the non-signers by the Supervisors who supported the union.

As part of my job duties, I am aware that the National Labor Relations Board (NLRB) upon which ERCOM is patterned, and ERCOM's sister organization, The Public Employees Relations Board (PERB) has the identical policy of holding such matters in strictest of confidence for the same reasons listed above.

After I was informed that Mr. Peter Burke, had possession of the summary list provided to ERCOM by the Association, I conducted an investigation of how it came into his possession by talking to ERCOM staff and relying upon my on first hand memory. I learned that the list along with the authorization cards had inadvertently been placed in a large box along with ERCOM's official public file. This should not have happened as ERCOM procedure requires never placing any of these confidential documents in the public official file, and requires that the public file be kept entirely separate from all confidential documents.

Mr. Peter Burke has visited ERCOM offices at least three times in the past three weeks. On at least two occasions he asked to meet with me, and met with me in my offices and questioned me about ERCOM rules and procedure. On one occasion while Mr. Burke was in the ERCOM offices, the Commission Secretary, Louise Perry, informed me that Mr. Burke had made a request to her to inspect the ERCOM file pertaining to the certification of ADDA. I then instructed her to provide the file to him, as is required by law for his inspection. At that time I was unaware that the confidential information described above had been inadvertently placed in a large box along with the official file. The entire box was then turned over to Mr. Burke, whereas I intended that only the public file be given to him. I was informed by Ms. Perry that Mr. Burke thereafter used the ERCOM copier to make some copies but that she was unaware of what he had copied. After a public file is turned over to a member of the public, the public is allowed to then use ERCOM's copier to make whatever copies they may choose from the public file.

As Executive Director of ERCOM I have requested that Mr. Burke return the list described above, and all copies thereof, as well as retrieve from any person who may

EXHIBIT 1,   P. 2

have been given copies all such copies, in order that ERCOM can keep such information strictly confidential as required by ERCOM Rules, policy and procedure. He has promised to do this and return all such copies by the end of this week.

I request the court to issue an order sealing, or otherwise restricting access, to the list attached to Mr. Burke's court filing in order to prevent the list from being made public to anyone.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 22, 2008 at Los Angeles County, CA.


PAUL RAYMOND CAUSEY
EXECUTIVE DIRECTOR,
LOS ANGELES COUNTY EMPLOYEE
RELATIONS COMMISSION

EXHIBIT 1,    P. 3

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT 4**

16

Page 1 of 3

## 90 DAY EVALUATION – GRADE I DDAs

EMPLOYEE NAME _Antonio Jeremy Moore_     EMPLOYEE NUMBER _535735_
DATE _7/9/08_   LOCATION _El Monte_     ROTATION NUMBER _1_

PLEASE RATE EMPLOYEE'S PERFORMANCE IN EACH OF THE BELOW CATEGORIES BY CHECKING THE APPROPRIATE BOX.

| PROFESSIONAL SKILLS | Unsatisfactory | Improvement Needed | Competent |
| --- | --- | --- | --- |
| Legal Knowledge | ☐ | ☐ | ☒ |
| Legal Reasoning | ☐ | ☐ | ☒ |
| Judgment | ☐ | ☒ | ☐ |
| Oral Presentation | ☐ | ☐ | ☒ |
| Written Presentation | ☐ | ☐ | ☒ |

| APPLICATION TO DUTIES | Unsatisfactory | Improvement Needed | Competent |
| --- | --- | --- | --- |
| Attendance | ☐ | ☐ | ☒ |
| Observation of Working Hours | ☐ | ☐ | ☒ |
| Availability | ☐ | ☐ | ☒ |
| Attitude | ☐ | ☐ | ☒ |
| Preparation | ☐ | ☒ | ☐ |
| Initiative | ☐ | ☐ | ☒ |
| Compliance with Department Policies | ☐ | ☐ | ☒ |

| ADAPTABILITY | Unsatisfactory | Improvement Needed | Competent |
| --- | --- | --- | --- |
| Performance in New Situations | ☐ | ☐ | ☒ |
| Performance with Minimum Instructions | ☐ | ☐ | ☒ |

| PERSONAL RELATIONS | Unsatisfactory | Improvement Needed | Competent |
| --- | --- | --- | --- |
| Getting Along with Fellow Employees | ☐ | ☐ | ☒ |
| Meeting and Handling the Public | ☐ | ☐ | ☒ |
| Personal Appearance | ☐ | ☐ | ☒ |

Employee spent the majority of this rotation in     PH Ct. ☐     Misd. Cal. Ct. ☒     Specialty Ct. ☐

Jury trials completed _____3_____

## COMMENTS

Use this space to describe employee's strengths and weaknesses. Give examples of work well done and plans for improving performance. Factor ratings of *Unsatisfactory* or *Improvement Needed* must be substantiated by comments. (Use attached sheet for comments if necessary.)

SEE ATTACHED

I have discussed the contents of this evaluation with employee.

_[signature]_
Rater's Signature

D0064

**EMPLOYEE NAME** Antonio Jeremy Moore
**DATE** July 9, 2008

**EMPLOYEE NUMBER** 535735
**ROTATION NUMBER** 1

## ADDITIONAL COMMENTS

Mr. Antonio Jeremy Moore has been at the El Monte Area Office since May 5, 2008. This is his first 90 day assignment. Mr. Moore is a personable, friendly and affable person who gets along well with the staff. He is striving to acclimate to the work of a Deputy District Attorney I. During this period of time, he has been assigned to a misdemeanor courtroom where he handles arraignments, pre trials, motions and trials.

Mr. Moore is competent in most areas of this evaluation with the exception of the following:

Professional Skills/Judgment

Mr. Moore needs to improve in his capacity to perceive, discern and make reasonable legal decisions regarding cases. In his management of calendar matters, he needs to spend more time evaluating and analyzing cases for strengths and weaknesses. This has become apparent with cases which have reached jury trial status and have not been evaluated thoroughly and completely. On a couple of occasions, Mr. Moore and I have spoken about using pre-trials to speak to defense attorneys about possible defenses and settling cases whenever possible, instead of waiting until the eve of trial. In regards to trials, Mr. Moore needs to improve his judgment in terms of which witnesses will be needed, the order they will testify and how to prepare questions for direct examination. In his trials, visual aids such as diagrams and pictures should have been utilized in order to better explain the incidents.

Application to Duties/Preparation

This is somewhat related to the area of Judgment discussed above. Mr. Moore needs to spend more time preparing his calendar on a daily basis to thoroughly familiarize himself with his cases. He needs to prepare his cases for both pre-trial and trial. In terms of pre-trial, Mr. Moore has shown that on occasion he has not researched defenses and/or requested discovery. In regards to trials, Mr. Moore has not anticipated witnesses for trial. In his first jury trial, a DUI trial, Mr. Moore added a (b) count on the eve of trial only to realize that he was not able to obtain an expert to testify as that count due to the lateness of the amendment. The amendment should have been done in a more timely manner in order to secure the witness for trial. This lack of preparation is due in part to his lack of judgment in evaluating and analyzing the cases at an earlier pre-trial date.

Page 3 of 3

EMPLOYEE NAME  Antonio Jeremy Moore          EMPLOYEE NUMBER 535735
DATE July 9, 2008                            ROTATION NUMBER  1

## ADDITIONAL COMMENTS

Conclusion

Mr. Moore is familiar with the duties of a deputy district attorney I. He has improved over the course of his assignment. He shows initiative in asking for guidance when needed. I assigned three DDA's to assist and guide him on calendar preparation and offers on three different occasions. While there has been some improvement, Mr. Moore needs to continue to work on his weaknesses. His current judge has expressed some frustration and concern with Mr. Moore's lack of preparation with both calendar management and trials and an inability to multi-task and focus with his duties in court. However, it is my belief that with the appropriate initiative and understanding, Mr. Moore has the potential to fully acclimate to the skills and duties of a DDA I.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26        **EXHIBIT 5**
27
28

FIRST AMENDED COMPLAINT

Page 1 of 2

## 90 DAY EVALUATION – GRADE I DDAs

**EMPLOYEE NAME** ANTONIO JEREMY MOORE    **EMPLOYEE NUMBER** 535735
**DATE** 10/14/08    **LOCATION** Downey Area Office    **ROTATION NUMBER** 2

PLEASE RATE EMPLOYEE'S PERFORMANCE IN EACH OF THE BELOW CATEGORIES BY CHECKING THE APPROPRIATE BOX.

| PROFESSIONAL SKILLS | Unsatisfactory | Improvement Needed | Competent |
|---|---|---|---|
| Legal Knowledge | ☐ | ☐ | ☒ |
| Legal Reasoning | ☐ | ☐ | ☒ |
| Judgment | ☐ | ☒ | ☐ |
| Oral Presentation | ☐ | ☒ | ☐ |
| Written Presentation | ☐ | ☐ | ☒ |

| APPLICATION TO DUTIES | Unsatisfactory | Improvement Needed | Competent |
|---|---|---|---|
| Attendance | ☐ | ☐ | ☒ |
| Observation of Working Hours | ☐ | ☐ | ☒ |
| Availability | ☐ | ☐ | ☒ |
| Attitude | ☐ | ☐ | ☒ |
| Preparation | ☐ | ☒ | ☐ |
| Initiative | ☐ | ☐ | ☒ |
| Compliance with Department Policies | ☐ | ☐ | ☒ |

| ADAPTABILITY | Unsatisfactory | Improvement Needed | Competent |
|---|---|---|---|
| Performance in New Situations | ☐ | ☐ | ☒ |
| Performance with Minimum Instructions | ☐ | ☐ | ☒ |

| PERSONAL RELATIONS | Unsatisfactory | Improvement Needed | Competent |
|---|---|---|---|
| Getting Along with Fellow Employees | ☐ | ☐ | ☒ |
| Meeting and Handling the Public | ☐ | ☐ | ☒ |
| Personal Appearance | ☐ | ☐ | ☒ |

Employee spent the majority of this rotation in    PH Ct. ☐    Misd. Cal. Ct. ☒    Specialty Ct.[1] ☐

Jury trials completed  1

## COMMENTS

In his second rotation with this office DDA Antonio Jeremy Moore has been assigned to a misdemeanor calendar court and has conducted one jury trial in Downey. He has also filed numerous misdemeanor cases.

At the beginning of this rotation, there were several issues regarding Mr. Moore's performance that needed to be addressed. In a discussion with his calendar judge, Judge Ray Jurado, the court indicated that in some cases Mr. Moore lacked sufficient preparation as to the facts of his case, criminal background of the defendant, and oral arguments he made to the court. In addition, Judge Jurado indicated that there were times when Mr. Moore was in and around the courtroom, yet did not notice when court sessions had resumed and calendar matters

---

[1] Such as Drug Court, Prop. 36 Court, Domestic Violence Court

**EMPLOYEE NAME**   ANTONIO JEREMY MOORE      **EMPLOYEE NUMBER** 535735
**DATE**   10/14/08                                   **ROTATION NUMBER**  2

### ADDITIONAL COMMENTS

were being called. Regarding his documentation of court proceedings, Mr. Moore's notes on dispositions in some of his case files were unclear and incomplete. In addition, the penmanship in his files also needed improvement.

I spoke with Mr. Moore about these issues and gave him guidance on what is expected of him and how to improve his performance. I reiterated the importance of thorough preparation for each of his cases and how he needed to maintain his awareness of what is going on in his courtroom surroundings. I suggested that Mr. Moore make better use of his time before calendar call to discuss his cases with defense counsel and conduct his witness checks in other court matters. In addition, I counseled Mr. Moore and assigned a Grade II deputy to assist him with improving the documentation on his misdemeanor case files. Throughout this rotation I have had several discussions with Mr. Moore about these performance questions. Mr. Moore understood what is expected of him and indicated he would take the necessary steps to improve.

In the first week of October 2008, Judge Jurado called me at my office to discuss Mr. Moore. The judge reported that since our previous discussion, Mr. Moore had made significant progress in his overall performance. He said that Mr. Moore was coming to court more prepared and knowledgeable about his cases. His dispositions were appropriate and his oral arguments on behalf of the People were well taken. Judge Jurado said Mr. Moore is making more efficient use of his time prior to calendar call and the court seems to be running more smoothly as a result of these changes. I have also noticed some improvement in the documentation of Mr. Moore's case files. His notes regarding dispositions are more complete and his penmanship, although not ideal, is tighter and more legible than it was previously.

Regarding his trial work, Mr. Moore has conducted one jury trial in Downey---a DUI case. Mr. Moore appeared to be confident and when he addressed the jury he spoke with conviction. He tailored a very thorough Powerpoint presentation for his case and argued persuasively on behalf of the People. At the end of the case the jury convicted the defendant as charged. I discussed the case with Mr. Moore and asked him to work on speaking to the jury without the extensive use of notes and to refrain from asking leading questions of his witnesses. Overall, however, I thought he did a commendable job. I think he would have benefited by doing more jury trials during this rotation.

Mr. Moore has a good attitude and I find him to be a very conscientious deputy who wants to learn and is not afraid to ask questions. If there are matters that need to brought to my attention he takes the initiative and talks to me about it. He complies with departmental policies and keeps regular working hours. Mr. Moore gets along well with others. He has a good relationship with his associates, staff and law enforcement personnel.

I believe the next 6 months are crucial in this deputy's career. Given the significant performance issues encountered in his first two rotations, Mr. Moore must continue to progress and demonstrate to his next Deputy-In-Charge or Head Deputy that the gains he has made are lasting performance improvements.

I have discussed the contents of this evaluation with Mr. Moore.

Mark Ashen
Deputy-In-Charge

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26          **EXHIBIT 6**
27
28

18

Page 1 of ____

## 90 DAY EVALUATION – GRADE I DDAs

EMPLOYEE NAME __Jeremy Moore__         EMPLOYEE NUMBER __535735__

DATE __1/9/09__    LOCATION __WHITTIER__         ROTATION NUMBER __3__

PLEASE RATE EMPLOYEE'S PERFORMANCE IN EACH OF THE BELOW CATEGORIES BY CHECKING THE APPROPRIATE BOX.

| PROFESSIONAL SKILLS | Unsatisfactory | Improvement Needed | Competent |
|---|---|---|---|
| Legal Knowledge | ☐ | ☐ | X |
| Legal Reasoning | ☐ | ☐ | X |
| Judgment | ☐ | X | ☐ |
| Oral Presentation | ☐ | X | ☐ |
| Written Presentation | ☐ | ☐ | X |

| APPLICATION TO DUTIES | Unsatisfactory | Improvement Needed | Competent |
|---|---|---|---|
| Attendance | ☐ | ☐ | X |
| Observation of Working Hours | ☐ | ☐ | X |
| Availability | ☐ | ☐ | X |
| Attitude | ☐ | ☐ | X |
| Preparation | ☐ | X | X |
| Initiative | ☐ | ☐ | X |
| Compliance with Department Policies | ☐ | ☐ | X |

| ADAPTABILITY | Unsatisfactory | Improvement Needed | Competent |
|---|---|---|---|
| Performance in New Situations | ☐ | ☐ | X |
| Performance with Minimum Instructions | ☐ | ☐ | X |

| PERSONAL RELATIONS | Unsatisfactory | Improvement Needed | Competent |
|---|---|---|---|
| Getting Along with Fellow Employees | ☐ | ☐ | X |
| Meeting and Handling the Public | ☐ | ☐ | X |
| Personal Appearance | ☐ | ☐ | X |

Employee spent the majority of this rotation in    PH Ct. X    Misd. Cal. Ct. ☐    Specialty Ct.[1] ☐

Jury trials completed __0__

## COMMENTS

Use this space to describe employee's strengths and weaknesses. Give examples of work well done and plans for improving performance. Factor ratings of *Unsatisfactory* or *Improvement Needed* must be substantiated by comments. (Use attached sheet for comments if necessary.)

Mr. Moore has been assigned primarily to conduct preliminary hearings. Mr. Moore is an earnest, hard-working attorney with a sincere passion for his work. He has however encountered problems with organization and execution of the preliminary hearings.

I have discussed the contents of this evaluation with employee.

_____
Rater's Signature

[1] Such as Drug Court, Prop. 36 Court, Domestic Violence Court

D0069

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26          **EXHIBIT 7**
27
28

FIRST AMENDED COMPLAINT

## Review 1   30 DAY EVALUATION - GRADE FORM

Field 1

EMPLOYEE NAME  Antonio Jerrez Moore        EMPLOYEE NUMBER  535393
DATE  1/6/92    LOCATION  El Toro          ROTATION NUMBER  1

PLEASE RATE EMPLOYEE'S PERFORMANCE IN EACH OF THE BELOW CATEGORIES BY CHECKING THE APPROPRIATE BOX

| PROFESSIONAL SKILLS | Unsatisfactory | Improvement Needed | Competent |
|---|---|---|---|
| Legal Knowledge | ☐ | ☐ | ☐ |
| Legal Processing | ☐ | ☐ | ☐ |
| Judgment | ☐ | ☐ | ☐ |
| Oral Presentation | ☐ | ☐ | ☐ |
| Written Presentation | ☐ | ☐ | ☐ |

| APPLICATION TO DUTIES | Unsatisfactory | Improvement Needed | Competent |
|---|---|---|---|
| Attendance | ☐ | ☐ | ☐ |
| Observation of Working Hours | ☐ | ☐ | ☐ |
| Availability | ☐ | ☐ | ☐ |
| Attitude | ☐ | ☐ | ☐ |
| Preparation | ☐ | ☐ | ☐ |
| Initiative | ☐ | ☐ | ☐ |
| Compliance with Department Policies | ☐ | ☐ | ☐ |

| ADAPTABILITY | Unsatisfactory | Improvement Needed | Competent |
|---|---|---|---|
| Performance in New Situations | ☐ | ☐ | ☐ |
| Performance with Minimum Instructions | ☐ | ☐ | ☐ |

| PERSONAL RELATIONS | Unsatisfactory | Improvement Needed | Competent |
|---|---|---|---|
| Getting Along with Fellow Employees | ☐ | ☐ | ☐ |
| Meeting and Handling the Public | ☐ | ☐ | ☐ |
| Personal Appearance | ☐ | ☐ | ☐ |

Employee spent the majority of his/her time in:   INV ☐   Med O.E.O. ☐   Specify O.T. ☐

Days Sick recorded   1

## Review 2   30 DAY EVALUATION - GRADE FORM

EMPLOYEE NAME  Antonio Moore        EMPLOYEE NUMBER  535393
DATE  1989    LOCATION  El Toro      ROTATION NUMBER  1

PLEASE RATE EMPLOYEE'S PERFORMANCE IN EACH OF THE BELOW CATEGORIES BY CHECKING THE APPROPRIATE BOX

| PROFESSIONAL SKILLS | Unsatisfactory | Improvement Needed | Competent |
|---|---|---|---|
| Legal Knowledge | ☐ | ☐ | X |
| Legal Processing | ☐ | ☐ | X |
| Judgment | ☐ | X | X |
| Oral Presentation | ☐ | X | |
| Written Presentation | ☐ | | X |

| APPLICATION TO DUTIES | Unsatisfactory | Improvement Needed | Competent |
|---|---|---|---|
| Attendance | ☐ | | X |
| Observation of Working Hours | ☐ | | X |
| Availability | ☐ | | X |
| Attitude | ☐ | | X |
| Preparation | ☐ | X | X |
| Initiative | ☐ | | X |
| Compliance with Department Policies | ☐ | | X |

| ADAPTABILITY | Unsatisfactory | Improvement Needed | Competent |
|---|---|---|---|
| Performance in New Situations | ☐ | | X |
| Performance with Minimum Instructions | ☐ | | X |

| PERSONAL RELATIONS | Unsatisfactory | Improvement Needed | Competent |
|---|---|---|---|
| Getting Along with Fellow Employees | ☐ | | X |
| Meeting and Handling the Public | ☐ | | X |
| Personal Appearance | ☐ | | X |

Employee spent the majority of his/her time in:   INV O. X   Med O.E.O. ☐   Specify O.T. ☐

Days Sick recorded   0

## Review 3   30 DAY EVALUATION - GRADE FORM

EMPLOYEE NAME  ANTONIO JERRAY MOORE        EMPLOYEE NUMBER  535393
DATE  1989    LOCATION  Orange Area Office   ROTATION NUMBER  1

PLEASE RATE EMPLOYEE'S PERFORMANCE IN EACH OF THE BELOW CATEGORIES BY CHECKING THE APPROPRIATE BOX

| PROFESSIONAL SKILLS | Unsatisfactory | Improvement Needed | Competent |
|---|---|---|---|
| Legal Knowledge | ☐ | ☐ | ☐ |
| Legal Processing | ☐ | ☐ | ☐ |
| Judgment | ☐ | ☐ | ☐ |
| Oral Presentation | ☐ | ☐ | ☐ |
| Written Presentation | ☐ | ☐ | ☐ |

| APPLICATION TO DUTIES | Unsatisfactory | Improvement Needed | Competent |
|---|---|---|---|
| Attendance | ☐ | ☐ | ☐ |
| Observation of Working Hours | ☐ | ☐ | ☐ |
| Availability | ☐ | ☐ | ☐ |
| Attitude | ☐ | ☐ | ☐ |
| Preparation | ☐ | ☐ | ☐ |
| Initiative | ☐ | ☐ | ☐ |
| Compliance with Department Policies | ☐ | ☐ | ☐ |

| ADAPTABILITY | Unsatisfactory | Improvement Needed | Competent |
|---|---|---|---|
| Performance in New Situations | ☐ | ☐ | ☐ |
| Performance with Minimum Instructions | ☐ | ☐ | ☐ |

| PERSONAL RELATIONS | Unsatisfactory | Improvement Needed | Competent |
|---|---|---|---|
| Getting Along with Fellow Employees | ☐ | ☐ | ☐ |
| Meeting and Handling the Public | ☐ | ☐ | ☐ |
| Personal Appearance | ☐ | ☐ | ☐ |

Employee spent the majority of his/her time in:   INV O. ☐   Med O.E.O. ☐   Specify O.T. ☐

Days Sick recorded   1

Average is 85% Competent ·· 15 % Needs Improvement ·· No Unsatisfactory Marks

COUNTY OF LOS ANGELES CIVIL SERVICE COMMISSION

**REPORT ON PROBATIONER-ATTORNEY**

MOORE, ANTONIO J.

EMPLOYER NAME: DEPUTY DISTRICT ATTORNEY

EMPLOYEE NUMBER: 370-CO-ADM-PRELIM

ITEM NUMBER: 9271A

635735

FROM 04/04/2008

DATE TO BE FILED: 04/03/2009

PERIOD: 04/03/2009

| RATE EACH FACTOR | COMPETENT IMPROVEMENT NEEDED UNSATISFACTORY | Use COMMENTS space to describe employee's strengths and weaknesses. Give examples of work well done and plans for improving performance. *(Factor ratings of Unsatisfactory or Improvement Needed must be substantiated by comments.)* |

Checking items OPTIONAL with department
+ Strong ✓ Standard ½ Weak

**1. PROFESSIONAL SKILLS** ☒ ☐ ☐
- LEGAL KNOWLEDGE
- LEGAL REASONING
- JUDGMENT
- ORAL PRESENTATION
- WRITTEN PRESENTATION

**2. APPLICATION TO DUTIES** ☐ ☒ ☐
- ATTENDANCE
- OBSERVANCE OF WORKING HOURS
- AVAILABILITY
- ATTITUDE
- PREPARATION
- INITIATIVE
- COMPLIANCE WITH DEPARTMENT POLICIES
- COMPLIANCE WITH SAFETY RULES

**3. ADAPTABILITY** ☒ ☐ ☐
- PERFORMANCE IN NEW SITUATIONS
- PERFORMANCE IN EMERGENCIES
- PERFORMANCE WITH MINIMUM INSTRUCTIONS

**4. PERSONAL RELATIONS** ☒ ☐ ☐
- GETTING ALONG WITH FELLOW EMPLOYEES
- MEETING AND HANDLING THE PUBLIC
- PERSONAL APPEARANCE

**5. SUPERVISORY ABILITY** (Only for Supervisors) ☐ ☐ ☐
- PLANNING AND ASSIGNING
- TRAINING AND INSTRUCTING
- DISCIPLINARY CONTROL
- EVALUATING PERFORMANCE
- LEADERSHIP
- MAKING DECISIONS
- FAIRNESS AND IMPARTIALITY
- APPROACHABILITY
- MAINTAINING AN EFFECTIVE SAFETY PROGRAM

**6. OTHER** ☐ ☐ ☐

**(Continue COMMENTS on attached sheet)**

**ACTION OF DEPARTMENT HEAD**
I CONCUR IN AND APPROVE THIS REPORT OF PERFORMANCE EVALUATION, ON THE BASIS OF THIS REPORT I:
☐ I APPROVE FINAL APPOINTMENT.
☐ I DO NOT APPROVE FINAL APPOINTMENT.
☐ REDUCE THE PROBATIONER FROM THE POSITION OF _____
☐ DISCHARGE PROBATIONER FROM THE SERVICE.

DEPT HEAD (OR AUTHORIZED REPRESENTATIVE) _____ DATE 3/9/09

REPORT DISCLOSED WITH EMPLOYEE
BY _____ DATE
THIS REPORT AND THE ACTION INDICATED ABOVE HAVE BEEN DISCUSSED WITH ME.
EMPLOYEE'S SIGNATURE _____ DATE
COPY OF REPORT GIVEN TO EMPLOYEE
BY _____ DATE

**USE WHEN PROBATIONARY PERIOD NOT COMPLETE**
☐ FAILED MEDICAL EXAMINATION _____ DATE
☐ RESIGNED FROM COUNTY SERVICE _____ DATE
☐ LEFT POSITION TO ACCEPT ANOTHER COUNTY POSITION _____ DATE

COPY OF REPORT MAILED TO EMPLOYEE _____ DATE
ADDRESS _____ DATE

**OVER-ALL EVALUATION:** UNSATISFACTORY ☐  COMPETENT ☒

**RECOMMENDATIONS TO DEPARTMENT HEAD**
☐ I DO
☒ I DO NOT
RECOMMEND THE PROBATIONER'S FINAL AND COMPLETE APPOINTMENT

RATER'S SIGNATURE _____ DATE 3-6-09

☐ I DO
☒ I DO NOT
RECOMMEND THE PROBATIONER'S FINAL AND COMPLETE APPOINTMENT

REVIEWER'S SIGNATURE Jacqueline Lacey DATE 3/6/09

DA-510-A-76R2877 Rev. 6/98